UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHANIE SUTHERLAND, on behalf of herself and all others similarly situated,<br><br>                  Plaintiff,<br><br>      v.<br><br>ERNST & YOUNG LLP,<br><br>                  Defendant. | Civ. Action No. 10-CV-3332 (KMW) |

ERNST & YOUNG LLP'S MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

AKIN GUMP STRAUSS HAUER & FELD LLP

Daniel L. Nash
Joel M. Cohn
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564
Telephone: 202-887-4000
Facsimile: 202-887-4288
dnash@akingump.com
jcohn@akingump.com

Estela Díaz
One Bryant Park
New York, NY 10036
Telephone: 212-872-1000
Facsimile: 212-872-1002
ediaz@akingump.com

Attorneys for Defendant Ernst & Young LLP

TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT......................................................................................1

BACKGROUND ..........................................................................................................3

I.      PROCEDURAL HISTORY ................................................................................3

II.     SUTHERLAND'S EMPLOYMENT AT ERNST & YOUNG ...........................................4

III.    THE PUTATIVE CLASS ....................................................................................5

       A.     Staffs ......................................................................................................6

       B.     Service Lines .........................................................................................8

       C.     Job Experiences Among Staffs Who Perform Audits ..............................9

             1.     Nature Of Assignment...................................................................9

             2.     Staffing......................................................................................10

             3.     Individual Ability And Motivation...............................................11

ARGUMENT...............................................................................................................13

I.      RULE 23 CERTIFICATION..............................................................................14

       A.     Individualized Issues Predominate ........................................................15

             1.     The Ho Court's Summary Judgment Decisions Underscore The Necessity Of Individualized Proof In This Action....................................17

             2.     The Record Confirms The Need For Individualized Proof.......................19

       B.     A Class Action Is Not The Superior Method Of Adjudication. ............................29

II.     FLSA "CERTIFICATION"...............................................................................30

       A.     Sutherland's Motion Cannot Survive The More Stringent "Second Step" Scrutiny. ..................................................................................................31

       B.     Sutherland Has Failed To Make Even A Modest Factual Showing That She Is Similarly Situated To The Members Of The Putative Class. ............................33

CONCLUSION............................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Amendola v. Bristol-Myers Squibb Co.*,
    558 F. Supp. 2d 459 (S.D.N.Y. 2008)......................................................................20

*Basco v. Wal-Mart Stores, Inc.*,
    No. Civ. A 02-009, 2004 WL 1497709 (E.D. La. July 2, 2004).............................32

*Bennett v. Progressive Corp.*,
    225 F. Supp. 2d 190 (N.D.N.Y. 2002) ...................................................................13

*Brooks v. Bellsouth Telecom., Inc.*,
    164 F.R.D. 561 (N.D. Ala. 1995)...........................................................................32

*Camp v. Progressive Corp.*,
    2003 WL 22800948 (E.D. La. Nov. 25, 2003) ......................................................14

*Catlett v. Eltra Corp.*,
    1977 WL 1684 (S.D.N.Y. Jan. 23, 1977) ..............................................................14

*Cima v. WellPoint Health Networks, Inc.*,
    250 F.R.D. 374 (S.D. Ill. 2008) .............................................................................30

*Cohen v. Gerson Lehrman Group*,
    686 F.Supp.2d 317 (S.D.N.Y. 2010).......................................................................35

*Copas v. East Bay Mun. Utli. Dist.*,
    61 F. Supp. 2d 1017 (N.D. Cal. 1999) ...................................................................21

*Cunningham v. Electronic Data Sys. Corp.*,
    06-civ-3530, 2010 U.S. Dist. Lexis 132127 (S.D.N.Y. Dec. 13, 2010) .................32

*Davis v. J.P. Morgan Chase & Co.*,
    587 F.3d 529 (2d Cir. 2009).....................................................................................25

*De Asencio v. Tyson Foods, Inc.*,
    342 F.3d 301 (3d Cir. 2003)....................................................................................35

*de la Cruz v. Gill Corn Farms, Inc.*,
    No. 03-CV-1133, 2005 WL 5419056 (N.D.N.Y. Jan. 25, 2005).............................35

*Diaz v. Electr. Boutique of America, Inc.*,
    No. 04-CV-0840E (SR), 2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) .................32

*Dingwall v. Friedman Fisher Assoc., P.C.*,
   3 F. Supp.2d 215 (N.D.N.Y. 1998) .................................................................13

*Edwards v. Publishers Circulation Fulfillment, Inc.*,
   268 F.R.D. 181 (S.D.N.Y. 2010) ............................................................16, 29

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982) ...........................................................................................14

*Gonzales v. Hair Club for Men, Ltd., Inc.*,
   2007 U.S. Dist. Lexis 26160 (M.D. Fla. Apr. 9, 2007) ...........................34

*Harper v. Lovett's Buffet, Inc.*,
   185 F.R.D. 358 (M.D. Ala. Jan. 25, 1999) ..............................................34

*Harrington v. Educ. Mgmt. Corp.*,
   No. 02 Civ. 0787 (HB), 2002 WL 1009463 (S.D.N.Y. May 17, 2002).................31

*Harris v. Initial Security, Inc.*,
   2007 WL 703868 (S.D.N.Y. Mar. 7, 2007) ..............................................29

*Hendricks v. J.P. Morgan Chase Bank, N.A.*,
   263 F.R.D. 78 (D. Conn. 2009)................................................ passim

*Hinojos v. Home Depot, Inc.*,
   2006 WL 3712944 (D. Nev. Dec. 1, 2006)...............................................31

*Iglesias-Mendoza v. La Belle Farm, Inc.*,
   239 F.R.D. 363 (S.D.N.Y. 2007) ..............................................................35

*In re Home Depot Overtime Cases*,
   No. JCCP4229, 2006 WL 330169 (Cal. Super. Ct. Feb. 2, 2006) ...........30

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008)......................................................................14

*In re Initial Pub. Offerings Sec. Litig.*,
   471 F.3d 24 .................................................................................................14

*Laroque v. Domino's Pizza, LLC*,
   557 F. Supp. 2d 346 (E.D.N.Y. 2008) ......................................................34

*Levinson v. Primedia Inc.*,
   No. 02 Civ. 2222 (CBM), 2003 WL 22533428 (S.D.N.Y. Nov. 6, 2003).........33, 34

*Mekhitarian v. Deloitte & Touche*,
   No. CV 07-412 DSF .........................................................................16, 20, 24

ii

*Mike v. Safeco Ins. Co.*,
    274 F. Supp. 2d 216 (D. Conn. 2003) ...................................................................34

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010) ..............................................................14, 15, 31, 33

*Nguyen v. BDO Seidman*,
    LLP, No. SACV07-1352, slip op. (C.D. Cal. July 6, 2009) .......................... passim

*Passa v. City of Columbus*,
    2010 WL 1372455 (S.D. Ohio Mar. 30, 2010) ....................................................29

*Piscione v. Ernst & Young, LLP*,
    171 F.3d 527 (7th Cir. 1999) ........................................................................24, 28

*Ray v. Motel 6 Operating, Ltd. P'ship*,
    No. 3-95-828, 1996 WL 938231 (D. Minn. Mar. 18, 1996)..................................32

*Reich v. State of New York*,
    3 F.3d 581 (2d Cir. 1993) ...................................................................................25

*Reyes v. Texas EZpawn, L.P.*,
    2007 WL 101808 (S.D. Tex. Jan. 8, 2007) ..........................................................26

*Roe-Midgett v. CC Services, Inc.*,
    512 F.3d 865 (7th Cir. 2008) ...............................................................................24

*Severtson v. Phillips Bev. Co.*,
    137 F.R.D. 264 (D. Minn. 1991)..........................................................................32

*Smith v. T-Mobile USA, Inc.*,
    No. CV 05-5274 ABC .....................................................................................31, 33

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008)................................................................................15

*Torres v. Gristede's Foods NY, Inc.*,
    No. 04 Civ. 3316 (PAC), 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006)...............31

*Torres v. Gristede's Operating Corp.*,
    628 F. Supp. 2d 447 (S.D.N.Y. 2008)..................................................................13

*Viola v. Comprehensive Health Mgmt.*,
    2010 WL 5463080 (M.D. Fla. Dec. 29, 2010).......................................................24

*Warner v. Orleans Home Builders, Inc.*,
    550 F.Supp.2d 583 (E.D. Pa. 2008) ....................................................................35

*Wirth v. Grant Thornton, LLP,*
No. 09-0832, slip op. (C.D. Cal. July 29, 2009) .................................................16, 24

*Zalewski v. PNC Financial Services Group, Inc.,*
555 F.Supp.2d 555 (W.D.Pa. 2008).................................................................24

**STATUTES & OTHER AUTHORITIES**

29 U.S.C.
§ 216(b) .................................................................................................31, 35

29 C.F.R. § 541.200 .......................................................................................14

29 C.F.R. §§ 541.201-205, 541.207-208, 541.210, and 541.215 ...............................18

29 C.F.R. § 541.201(b) ...................................................................................24

29 C.F.R. § 541.201(c) ...................................................................................25

29 C.F.R. § 541.203(a-f) .................................................................................21

29 C.F.R. § 541.207(e)(1) ...............................................................................20

29 C.F.R. § 541.301(a)..............................................................................26, 28

29 C.F.R. § 541.301(b) and (a)(1)-(2) ...............................................................14

29 C.F.R. § 541.301(e)(5) ...............................................................................26

29 C.F.R. § 541.700 ........................................................................................1

29 C.F. R. § 541.700(a)........................................................................14, 24, 25

29 C.F.R. § 541.705 ......................................................................................14

12 N.Y.C.R.R. § 142-2.2 ...................................................................................1

Cal. Code Regs., Title 8, § 11040(1)(A)(2)(f) ......................................................18

Fed. R. Civ. P. 23(b)(3)........................................................................14, 15, 31

Fed. R. Civ. P. 23(b)(3)(A)..............................................................................29

Fed. R. Civ. P. 23(c)(2).................................................................................35

PRELIMINARY STATEMENT

Plaintiff Stephanie Sutherland is a former Ernst & Young professional who claims that she was improperly classified as exempt from federal and New York overtime laws.  Her lawsuit is an extension of several consolidated class actions pending in a California federal court ("*Ho*"), where for several years her lawyers have prosecuted substantially similar claims on behalf of a putative class that includes many of the individuals Sutherland now purports to represent.  The *Ho* plaintiffs moved for certification of a class of Ernst & Young professionals in August 2010. Four months later, Sutherland filed the instant motion based on the *Ho* record—with no evidence from members of *her* putative classes concerning the work they actually performed, other than her own self-serving testimony.  Thus, in seeking certification of an overlapping class, Sutherland asks this Court to apply the same class certification standards to a virtually identical factual record.  Her counsel's effort to simultaneously litigate the same class issues in two courts should be rejected, and Sutherland's class motion should be denied.

Sutherland cannot prove that common factual issues would predominate in a class trial, as is necessary to justify certification under Rule 23 and, given the robust evidentiary record, under the Fair Labor Standards Act ("FLSA") as well.  A class trial would focus on whether hundreds or thousands of professionals satisfy the requirements of the "administrative" exemption, the "learned professional" exemption, or both.  Federal and New York law require that that these exemptions be applied by analyzing the work actually performed by the employee and "the amount of time" spent on various job duties.  *See* 29 C.F.R. § 541.700; 12 N.Y.C.R.R. § 142-2.2. The critical issues that a jury would need to resolve include whether class members exercise the requisite discretion and independent judgment and are primarily engaged in exempt work.

The *Ho* court's summary judgment decisions demonstrate that these issues cannot be decided uniformly for an entire class of staffs, but rather require an individualized analysis of an

employee's job experiences.  The court applied California's administrative exemption, which is similar in many respects to the federal and New York counterparts at issue here.  After analyzing evidence of the work they actually performed, including their own testimony and performance evaluations, the court held that one named plaintiff satisfied this exemption but factual disputes existed concerning another plaintiff's exempt status.  The court reached these different results by examining the disparate experiences of the two individuals—analyses that illustrate that the exempt status of thousands of staffs cannot be decided based on common evidence.

The record evidence established through discovery confirms that resolving Sutherland's claims requires the type of individualized analysis that is impossible in a class action.  For example, Sutherland contends that she exercised no discretion and judgment (Sutherland Tr. 176:24-177:11), but another staff whose declaration she cites testified at deposition that he applied "independent and objective professional judgment" "in everything [he] did."  (Morris Tr. 93:10-18.)  Sutherland claims that she could not interact with clients about significant matters (Mot. at 9), but another staff communicated with clients "on a daily basis," often about delicate issues such as client accounting errors.  (Duttlinger Dec. ¶ 14.)  And Sutherland's witnesses claim that any "attentive" person with "English language" and "typing skills" could perform the staff job (Alsheleh Dec. ¶ 6), but those who met Ernst & Young's expectations applied particular expertise in performing their work, including advanced degrees in accounting.

The disparate duties, discretion, and supervision among Sutherland's own witnesses confirm that the key issues cannot be decided absent consideration of an employee's particular circumstances, as shown by testimony from supervisors, review of documents that pertain only to the individual, and cross-examination of potential class members whose deposition testimony often contradicts their declarations.  These issues, as well as specific defenses to the claims of

particular class members, cannot be resolved uniformly for a class.  The need for individualized analysis is antithetical to class treatment and requires that Sutherland's motion be denied.

Confronted with this inescapable conclusion, Sutherland resorts to a number of arguments that are contrary to law.  She argues that an employer's decision to uniformly classify a group of employees as exempt requires class treatment, but the Second Circuit has squarely rejected this position.  She contends that no unlicensed staff can be exempt because industry standards and Ernst & Young's policies require supervision and review of their work, but the *Ho* court rejected this position in holding that the original named plaintiff, who was not a licensed CPA, was exempt as a matter of law.  And she contends that staffs cannot be administratively exempt because they are actually "production" workers, but the *Ho* Court twice rejected this position in holding that two of the named plaintiffs performed administrative work.

In short, every central premise of Sutherland's motion is legally insupportable.  But regardless, they cannot change what the summary judgment decisions and record evidence make clear:  Sutherland's claims cannot form the basis for a judgment applicable to an entire class due to the wide variation among staffs with respect to every disputed element of the exemptions.

<u>BACKGROUND</u>

I.    <u>PROCEDURAL HISTORY</u>

Since 2005, Ernst & Young has been defending against several putative class actions in California federal court in which the plaintiffs, former professionals, claim that they were improperly classified as exempt from California's overtime laws.  (Knopp Dec. ¶ 2.)  In August 2010, these plaintiffs moved for certification of a class that includes individuals in the "staff 1" and "staff 2" job positions who performed audits in California.  (*Id.* ¶ 11.)

In April 2010, the same lawyers as in California filed the instant action on behalf of Sutherland, who also claims that Ernst & Young misclassified her and other professionals as

3

exempt from overtime laws.  (*Id.* ¶ 10.)  Sutherland asserts her claims under federal and New York law and purports to represent all staffs 1 and staffs 2 nationwide who performed audits and were not licensed accountants.  (Mot. at 1.)  Many such individuals—those in California—are members of the putative class in the long-standing *Ho* action.

In December 2010, Sutherland moved for class certification, supporting her motion almost exclusively with the same evidence that the *Ho* plaintiffs use to support their own class motion.  (Knopp Dec. ¶ 12.)  In fact, Sutherland submits 8 declarations obtained from putative class members in *Ho*, and *none* from individuals who worked for Ernst & Young in New York or anywhere else outside of California.  All of these witnesses state in their declarations that they want to be part of a class action *in California*.  (*Id.*)

## II.   SUTHERLAND'S EMPLOYMENT AT ERNST & YOUNG

Sutherland worked for Ernst & Young for approximately one year until December 2009, when she was fired for abandoning her job.  (Sutherland Tr. 39:6-41:12.)  Before her employment began, Sutherland earned a bachelor's degree in accounting from the State University of New York, where she learned accounting and auditing standards and how to analyze financial statements.  (Sutherland Tr. 84:3-18; 87:14-20.)

While still a student, Sutherland worked as a summer intern for Ernst & Young.  (*Id.* at 94:17-23.)  She testified that this internship helped her understand how professional accountants apply the accounting principles she was learning in college.  (*Id.* at 98:22-99:3.)  As an intern, Sutherland claims that she was "[r]esponsible . . . for all aspects of client audit including financial statement reconciliations, and various tests of controls."  (Knopp Dec. ¶ 22.)

Following the internship, Ernst & Young offered Sutherland full-time employment, an annual salary of $55,000, and a signing bonus of $4,000.  (Sutherland Tr. at 128:2-13.)  Sutherland began her employment as a "staff 1" in New York in September 2008 and was

assigned to the Financial Services Office of the "Core Assurance" practice.  (*Id.* at 128:13-15, 258:7; Dep. Exh. 6.)

At the outset of her employment, Sutherland was trained to apply professional accounting standards in everything she did.  (*Id.* at 106:21-107:3.)  She received additional training during her employment, including regarding derivatives and credit default swaps so that she could better understand the business of her financial services clients.  (*Id.* at 108:13-110:7, 166:4-23; 233:19-234:23.)  In addition, Sutherland studied for and took the CPA examination during the course of her employment, and was paid for her time spent studying.  (*Id*. at 68:11-23.)

As a staff 1, Sutherland spent most of her time on audit engagements for two financial services clients.  (*Id.* at 130:15-131:4.)  In performing her work, Sutherland understood that she needed to be skeptical of the information clients provided; tried to present information in straightforward and easy to understand terms; approached the client when she found discrepancies in the client's documents; and communicated with the client independently and effectively.  (*Id.* at 183:17-23, 202:3-8; 196:15-197:2; 214:23-215:5.)

Sutherland worked independently on audits as she gained experience.  (*Id.* at 245:17-246:16).  In fact, during her final project, she was the only Ernst & Young professional at the client site and was "supposed to do everything" on the audit herself.  (*Id.* at 45:4-12.)

III.    <u>THE PUTATIVE CLASS</u>

Ernst & Young is an international accounting and consulting firm.  (Geist Dec. ¶ 2.)  The firm's U.S. operations are divided into four practice groups ("service lines"), which provide distinct professional services to the firm's clients:  Tax, Assurance, Advisory, and Transaction Advisory Services.  (*Id.* ¶ 3.)  These service lines are further divided into smaller practice groups called "sub-service" lines.  (*Id.*)  Ernst & Young's professionals are typically assigned to a particular service line and to a sub-service line therein.  (*Id.*)  These professionals work in the

following positions ("ranks"), in ascending order:  staff 1, staff 2, senior 1, senior 2, senior 3, manager, senior manager, and partner/principal.  (*Id.* ¶ 4.)

Sutherland purports to represent individuals who worked for Ernst & Young nationwide in the staff 1 and 2 positions and who "perform[ed] audits" and were not licensed CPAs.  (Mot. at 1.)  The duties of these individuals are explained below based on a record that includes deposition testimony of several individuals who provided the *Ho* plaintiffs with declarations,[1] declarations from 19 putative class members from across the country, and deposition testimony of several Ernst & Young Rule 30(b)(6) witnesses who testified in *Ho*.

A.    Staffs

A staff is a salaried employee with a bachelor's degree, and frequently a graduate degree, in a field such as accounting, finance, or economics.  (Geist Dec. ¶ 5.)  Staffs are also expected to have, or to be actively pursuing, a relevant professional credential, such as licensure as a CPA. (*Id.*)  All Ernst & Young professionals, including staffs 1, are expected to apply independent analysis, resolve problems, identify issues or inaccuracies with data, test data and assumptions being made, analyze issues and identify patterns or trends, conduct research, interpret documents, and grasp complex issues.  (*See, e.g.,* Morris Tr. 68:5-9; 73:10-16; 70:6-10; 77:3-11; 78:2-80:3.)  As employees progress, they are expected to apply their knowledge and take on more responsibility and more complex assignments.  (Crease ¶18.)

---

[1]  Sutherland relies on nine declarations proffered by the *Ho* plaintiffs.  As shown throughout this brief, several of these witnesses who gave depositions contradicted their declarations in significant ways, illustrating the need for individualized cross-examination.  Just by way of example, Stephen Morris stated in his declaration that, "This was really just a clerical or support type job involving little or no exercise of independent judgment," but at deposition, he testified that he used "independent and objective professional judgment in applying auditing and accounting standards" in "everything [he] did."  ([Morris Tr. 93:10-24; 252:5-17].)  Three of Sutherland's witnesses—Alsheleh, Stout, and Pham—were not available for depositions.  (Knopp Dec. ¶ 27.)

A staff 2 is generally someone who has satisfactorily worked at Ernst & Young for approximately one year or has comparable work experience.  (Geist Dec. ¶ 5.)  Due to their experience, staffs 2 may be given more responsibility and more complex assignments than staffs 1.  (Wyatt Dec. ¶ 4 [as staff 2, she took on more complex accounts that involved "a great deal of subjectivity" and "judgment"]; Oswalt Dec. ¶ 11 [assigned to higher risk audit areas requiring him to use judgment in evaluating assumptions client made, which "can be highly subjective"]; Hendershott Dec. ¶ 11 [tested "more complicated accounts"].)

Many staffs 2 perform "senior" duties as well.  A senior generally is someone who has worked for Ernst &Young for approximately least two years (or has comparable work experience) and has performed well enough to advance from a staff 1 to a staff 2, then from a staff 2 to a senior 1.  (Geist Dec. ¶ 5.)  Due to this additional work experience, seniors generally possess greater technical knowledge and experience and thus perform a number of additional duties.  For example, seniors are responsible for assigning work to staffs, reviewing the work of staffs, formally evaluating staffs, and assisting in planning and managing engagements.  (Morris Tr. 166:14-22; 156:23-161:1.)  Staffs 2 frequently function as the acting senior on engagements, spending as much as 50 percent of their time performing these managerial functions.  (*Id.* 149:19-150:18.)  In fact, Sutherland's work performance was formally evaluated by another staff, whom Sutherland now purports to represent.[2]  (Sutherland Tr. 47:15-23.)

---

[2] Sutherland claims that college interns perform the same work as staffs.  (Mot. at 6.)  But she testified that her internship was an "introductory," "cushy position" involving going out to dinner a lot and designed "to get a better idea . . . of what you were actually going to do" as a staff.  (Sutherland Tr. 94:24-95:19.)  For example, she "got to sit there and kind of see what [the audit team] did for a walkthrough."  (*Id.* at 97:15-24.)  To the extent that interns perform staff work, that work is exempt.  Nothing prevents an employer from assigning exempt work to a non-exempt employee.

B.     Service Lines

Staffs in several service lines "are employed in performing audits" to varying degrees. (Mot. 1.)  The Assurance service line includes the Core Assurance group, which provides audit services to clients, including auditing of financial statements and of internal controls pursuant to the Sarbanes-Oxley Act ("SOX 404").  (Borowski Tr. 22:6-23:3, 23:12-24:10.)  Staffs in Core Assurance may be assigned to a particular industry and can be dedicated to serving clients in that industry.  (Geist Dec. ¶ 6.)  Sutherland, a staff 1 dedicated to serving financial services clients, testified that her job included auditing internal controls and performing walkthroughs and substantive testing of accounts like payroll, cash, accounts payable, credit derivatives, and intercompany transactions.  (Sutherland Tr. 60:7-62:17; 195:6-20; 207:14-208:8; 216:3-21.)

The Advisory service line includes two sub-service lines that perform audit work.  The Information Technology Risk and Assurance ("ITRA") sub-service line audits clients' information technology ("IT") controls and processes.  (Glover Tr. 79:22-80:4.)  Staffs work with client personnel to understand the IT environment, including the types of programs and applications used and their role in the client's business.  (Lie Dec. ¶ 5, 7.)  They then assess how the controls should function and test whether they are functioning properly.  (*Id.* ¶ 9.)  Many ITRA staffs pursue a Certified Information Systems Auditor license, as opposed to a CPA license, because their work focuses on IT operations.  (Glover Tr. 20:16-21:2; Lie Dec. ¶ 3.)

The Risk sub-service line exists to "help[] companies assess, understand, and work with clients to develop risk mitigation strategies."  (Glover Tr. 13:8-12)  Risk employees assist companies improve the ways they achieve their business objectives, including by conducting internal audits, which are not performed in accordance with generally accepted auditing standards.  (*Id.* at 13:13-18.)  Staffs interview client personnel, summarize risk management processes, and test risk management controls.  (Lie Dec. ¶ 4.)  They generally do not pursue a

8

CPA license, but often obtain a Certified Internal Auditor designation instead.  (Glover Tr. at 20:16-21:2; Lie Dec. ¶ 3.)

The Tax group includes three sub-service lines that provide a variety of tax compliance and consulting services:  International Tax, Federal Tax, and State and Local Tax.  (*See* DiNicola Tr. 50:7-19; Bertolino Tr. 25:25-28:9; Bryant Tr. 21:25-22:22.)  The Tax service line also includes staffs who perform audit work.  (Geist ¶ 7; Chau Dec. ¶ 5 [as Tax staff 1, spent time performing audit for small company].)

C.    Job Experiences Among Staffs Who Perform Audits

The record demonstrates that the jobs of two putative class members in the same sub-service line and rank may materially differ depending on a number of factors, including the nature of the projects, staffing, and the individual's aptitude and motivation.  Whether an individual has obtained a CPA license, however, generally does not impact the work he or she is assigned.  (Altobello Tr. 114:9-115:20; Gibson Dec. ¶ 5.)

1.    Nature Of Assignment

The responsibilities of staffs may vary greatly according to the requirements of each project.  For example, one Core Assurance staff spent as much as 50 percent of her time interacting with client personnel on one project, but on another project she did not interact with client personnel at all.  (Fernandez Tr. 193:12-194:6.)  On another project, she monitored fraud at casinos by observing cash handling practices and documenting her observations.  (*Id.* at 93:15-94:7; 96:13-19.)  By contrast, another assignment entailed testing a client's internal control processes by reviewing data in spreadsheets.  (*Id.* 67:10-68:18.)

Sutherland testified that she participated only minimally in audit planning meetings and did not have any input on how the audit was planned.  (Sutherland Dec. ¶ 12.)  By contrast,

another Core Assurance staff was involved in audit planning, including writing a memorandum regarding audit strategy.  (Hendershott Dec. ¶ 9; Long Dec. ¶ 9.).

Sutherland also claims that she spent a "great deal of time" performing secretarial or support functions, such as ordering meals, getting coffee, getting supplies, and making copies. (Sutherland Dec. ¶ 12.)  By contrast, other staffs spent as little as two percent of their time performing such ministerial tasks.  (Liconti Dec. ¶ 14.)

2.   Staffing

Staffs also perform materially different duties depending on how a project is staffed. Sutherland's experience proves this point.  During her last client engagement, Sutherland was the only professional at the client site and was responsible for "everything."  (Sutherland Tr. 45:4-18.)  She recalled reviewing the prior year's work papers, performing a walkthrough, and performing tests of controls by herself.  (*Id.* at 49:15-50:19; 48:14-22.)  On another project, which had a larger team, Sutherland testified that she "really never worked on [her] own" and that a staff 2 was always nearby to review her work.  (*Id.* at 190:22-191:3.)

Another putative class member worked on a project as a staff 1 with no other staffs and seniors and, as a result, worked with "no direct supervision" and was "solely responsible for interacting with the client and testing the controls on [his] own."  (Hymers Dec. ¶ 5.)  By contrast, on a larger, more heavily-staffed engagement, he was assigned a "narrower scope of duties."  (*Id.* at ¶6; *compare* Whitton Dec. ¶¶ 12, 16 [worked under minimal supervision as a staff 1]; Lew Dec. ¶ 9 [worked directly with clients as staff 1 on smaller engagements, but not larger ones]; Blagrove Decl. ¶ 16 [less supervision on smaller teams].)

Further, some staffs assume substantially different responsibilities depending on the particular client.  (Dodd Dec. ¶ 7 [interacted with "higher levels of management such as the controller or CFO" for smaller client and "accounting managers" for larger client]); Hendershott

Dec. ¶ 12; Chow Dec. ¶ 8 [as staff 2, for certain clients she worked closely with company management, including "Controllers, Accounting Managers, and Directors of Cost Accounting"].).

Likewise, some managers gave staffs more responsibility than others.  (Gibson Dec. ¶ 18 [tested more complex accounts because manager trusted his abilities]; Fernandez Tr. 111:3-112:20 [some managers were more "hands off" while others supervised staff more closely].)

       3.   <u>Individual Ability And Motivation</u>

The duties of putative class members also depend on the extent to which they push themselves to excel and apply their educational background and professional knowledge and training.  While Sutherland never made suggestions about how the audit should be conducted (Sutherland Tr. 64:22-65:12), other staff "ma[de] suggestions as to how previous work products or approaches c[ould] be improved" and "challenge[d] the way things get done by providing suggestions and alternatives."  (Morris Tr. 81:19-82:1; 92:5-9].)

Some professionals contend that auditing work does "not involve actually analyzing the client's financial documents" or "anything [they] learned as part of [their] undergraduate education."  (Landon Dec. ¶ 5(vi): Sutherland Dec. ¶ 14.)  But others use their "accounting background to evaluate the sufficiency of the client's explanation."  (Dodd Dec. ¶ 8; Agopian Dec. ¶ 9; Liconti Dec. ¶ 17; Rothacker Tr. 138:5-139:2.)  When a discrepancy or issue arises because client data is insufficient, a staff may "make the decision to go back to the Controller (or the relevant client contact) to gather further information" to resolve the problem.  (Lew Dec. ¶ 9; Crease Dec. ¶ 16 [must be ready "to challenge or question information provided by the client"].)

Some potential class members contend that testing a client's internal controls (conducting a "walkthrough") in keeping with SOX 404 involves simply confirming that the client performed the necessary steps and reporting any irregularities to their superiors.  (Fernandez Tr. 136:22-

137:16.)  Others understand that the objective is "to really understand the client's financial processes," "including how certain 'internal controls' put in place by the client work to prevent fraud and increase the reliability of the financial process."  (Dodd Dec. ¶¶ 5, 6; *see also* Rothacker Tr. 61:7-62:12 [perform walk-through to understand client processes].)  If the internal controls  "do not function as intended in the samples [selected], such professionals decide to "increase [the] sample selection and perform additional tests."  (Dodd Dec., ¶ 6.)

When issues or exceptions arise, staffs who meet Ernst & Young's expectations do not simply report them to their supervisors, but try to "dig deeper and talk to the client" to determine if the discrepancy is actually an exception or if there is another explanation.  (Liconti Dec. ¶ 16.) When bringing a potential exception to the attention of a senior, Gibson would "discuss what steps to take to resolve the exception, such as whether to expand the sample size, and [he] would share the information [he] knew as well as [his] observations."  (Gibson Dec. ¶ 11.)

Some potential class members believe their job at client meetings is to "take verbatim notes . . . exactly as if I was a stenographer."  (Dancer Dec. ¶ 5.iv.)  But other professionals testified that client interaction was a significant part of their job duties, and that they were required to work directly with the client to obtain the documentation needed to complete the audit and to "communicate requests and disagreements in a professional manner." (Duttlinger Dec. ¶ 14; *see* Crease Dec. ¶ 18 [worked directly with client on daily basis, including accounting directors and controllers]; Liconti Dec. ¶ 15 [routinely asked client for documentation, sought clarification or explanations from client, and discussed and resolved issues with client].)

Within a short period of time, staffs who apply their technical knowledge and professional skepticism see their "responsibilities change[] significantly."  For example, they become responsible for auditing increasingly "complex accounts" that are riskier, more difficult,

and require more judgment.  (Crease Dec. ¶ 11.)  In addition, because of their "proven competence," they are asked to assume senior roles.  (Hymers Dec. ¶ 10.)  Thus, they plan engagements, prepare audit strategy memoranda, direct and review the work of other staffs, lead client meetings, and otherwise communicate extensively with clients.  (Morris Tr. 149:19-150:18; Long Dec. ¶ 9 [responsible for supervising junior staff, answering their questions, as well as reviewing their work]; Chow Dec. ¶ 7 [took on lead role on engagements as staff 2, supervising other staffs and reviewing their work]; Banks Dec. ¶ 8 [acting senior as a staff 2]; Liconti Dec. ¶ 11 [same].)  Such professionals spend very little time performing clerical work.  (Dodd Dec. ¶ 10; Crease Dec. ¶ 15.)

## ARGUMENT

Relying on the California evidentiary record, Sutherland seeks certification of two overlapping classes of staffs 1 and 2 "who perform audits:"  a Rule 23 class consisting of those who worked in New York since April 2004, and an FLSA class consisting of those who worked nationwide since April 2007.  (Compl. ¶ 1.)  Ernst & Young contends that these individuals were properly classified as exempt from federal and New York overtime laws under the administrative exemption, the learned professional exemption, or both.[3]

At this stage, the Court must determine, among other things, whether the elements of these exemptions can be decided for thousands of individuals based on evidence that is common to a class.  For the administrative exemption, these elements include whether the employee's primary duty is (1) directly related to the management or general business operations of the

---

[3]  Because New York's "overtime provisions expressly incorporate the FLSA exemptions, courts regularly look to the FLSA when considering the scope of overtime exemptions under New York law." *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 455 n.4 (S.D.N.Y. 2008); *Dingwall v. Friedman Fisher Assoc., P.C.*, 3 F. Supp.2d 215, 220-21 (N.D.N.Y. 1998); *Bennett v. Progressive Corp.*, 225 F. Supp. 2d 190, 215 (N.D.N.Y. 2002) (exemption analysis under the FLSA applied "equally" to plaintiff's claims under New York law).

employer or its customers, and (2) includes the exercise of discretion and independent judgment with respect to matters of significance.  29 C.F.R. § 541.200.  With respect to the learned professional exemption, the substantive issues include whether the employee's primary duty (1) consists of work that requires advanced knowledge in a field of science or learning, and (2) includes the "consistent exercise of discretion and judgment."  29 C.F.R. § 541.301(b) and (a)(1)-(2).  To decide whether these issues can be evaluated on a class or collective basis, the Court must consider the evidence necessary to determine *the duties the employees actually perform.*  *See Myers v. Hertz Corp.*, 624 F.3d 537, 549 (2d Cir. 2010); 29 C.F. R. § 541.700(a).[4]

I.    <u>RULE 23 CERTIFICATION</u>

Where, as here, a plaintiff seeks certification under Rule 23(b)(3), she must show that (1) common questions of law and fact predominate over questions affecting individual class members, and (2) a class action is superior to other means to adjudicate the controversy.  Determining whether a plaintiff has met her burden requires "rigorous analysis."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 33, n.3, 41 (2d Cir. 2006) (court "must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met.").  "Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008); *see also*

---

[4]  Sutherland cites this standard, but then argues around it.  First, she urges the Court to consider duties that staffs do *not* perform, rather than the ones they perform.  (Mot. at 8.)  Second, she contends that staffs are "training" to become CPAs and are thus automatically non-exempt.  (*Id.* at 16.)  But trainees are entitled to overtime only if they "are not actually performing the duties" of an exempt employee.  29 C.F.R. § 541.705; *see Camp v. Progressive Corp.*, 2003 WL 22800948, at *4 (E.D. La. Nov. 25, 2003); *Catlett v. Eltra Corp.*, 1977 WL 1684, at *8 (S.D.N.Y. Jan. 23, 1977) (trainee was exempt because he was performing exempt duties).  Thus, regardless of whether staffs undergo training, the Court still must analyze the work they actually perform.

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

A.     Individualized Issues Predominate

Rule 23(b)(3) is satisfied only if "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Myers*, 624 F.3d at 547 (internal quotation and citation omitted).  In a misclassification case, such as this one, the Court must focus on the proof relevant to the disputed elements of the exemption.  *See id.*  Sutherland suggests that the Court need not analyze the proof relevant to these elements because Ernst & Young uniformly classified staffs as exempt.  (Mot. at 3, 29-30.)  But the Second Circuit has squarely rejected the argument that an employer's uniform classification of a group of employees alone is determinative of the predominance inquiry.[5]  *See id.* at 549.

Thus, the Court must look beyond the classification decision and assess whether the disputed elements of the exemptions can be applied uniformly to an entire potential class consisting of thousands of individuals.  As the Second Circuit explained, "conceded" issues, such as whether the employees worked overtime hours or were paid according to a uniform policy are:

> clearly less substantial in the overall mix of issues . . . when compared to the ultimate (contested) question the district court would have to decide in any potential class action—whether plaintiffs were *legally entitled* to the overtime they were not paid.

*Id.* at 550-51 (emphasis in original).

---

[5]  Sutherland's position also is inconsistent with her class definition, which *excludes* many staffs subject to this "uniform" policy, such as those with licenses and the staff whom the *Ho* court determined was properly classified.

Where the disputed elements of an exemption cannot be applied without examining the job experiences of particular individuals, common factual issues do not predominate, and class certification is consistently denied. *See Edwards v. Publishers Circulation Fulfillment, Inc*., 268 F.R.D. 181, 183-84 (S.D.N.Y. 2010) (denying certification where determination of exempt status of newspaper delivery drivers required analysis of their job duties and control by supervisors); *Hendricks v. J.P. Morgan Chase Bank, N.A.*, 263 F.R.D. 78, 90 (D. Conn. 2009) (denying certification of exemption claim by "fund accountants" because differences between "proposed class members' job responsibilities outweighed their similarities"); RJN, Ex. A (*Mekhitarian v. Deloitte & Touche*, No. CV 07-412 DSF (MANx), 2009 WL 6057248, at *5 (C.D. Cal. Nov. 3, 2009) (denying certification of exemption claim by tax "associates" because they "engaged in a wide variety of tasks of varying complexity" and thus individual issues predominated)); RJN, Ex. B (*Wirth v. Grant Thornton, LLP*, No. 09-0832, slip op. at 6 (C.D. Cal. July 29, 2009) [DKT#65] (denying certification of exemption claim by unlicensed "associate" accountants given "individual variation within each rank, based on the employee's unique background, particular auditing experience, performance level, basic smarts, etc.")); RJN, Ex. C (*Nguyen v. BDO Seidman*, LLP, No. SACV07-1352, slip op. at 8 (C.D. Cal. July 6, 2009) [DKT#78] (denying certification of exemption claim by "associates" in the "assurance" and "tax" groups because evidence "indicates not only that job duties varied between associates and senior associates, but also that these duties varied even among associates of the same division and service line")).[6]

---

[6]  Sutherland relies on two other class decisions involving accounting firms (Mot. at 21), but she makes no effort to explain how the positions at issue compare to those here.  Moreover, neither of those cases involved a factual record, including deposition testimony of the plaintiff's own witnesses, that overwhelmingly demonstrates variation among putative class members with respect to all the disputed elements of the exemptions.  As explained below, this record precludes class certification here.  *See*

1.     The *Ho* Court's Summary Judgment Decisions Underscore
The Necessity Of Individualized Proof In This Action.

The *Ho* court has decided two summary judgment motions in ways that illustrate that the exemptions cannot be evaluated based on evidence that is sufficiently common to permit a uniform judgment to an entire class.

The original named plaintiff, David Ho, worked as a staff and claimed to be representative of other professionals, including many of the "staffs who performed audits" who Sutherland now seeks to represent.  Ho opposed Ernst & Young's summary judgment motion with a declaration stating that, like Sutherland, "he spent more than 80 percent of his time for E&Y performing clerical or secretarial support (often data entry) assignments."  (*Ho* at 3.)  But the court found that "Ho's deposition testimony shows that he performed activities typical of a tax consultant" and frequently used his professional training, experience and knowledge in performing work that required discretion and judgment and that was performed under only general supervision.  (*Id.* at 4-5.)  The court further determined that Ho "researched tax issues, regularly reviewed the Tax Code, and translated complex tax issues into plain English for clients who did not have the tax expertise he did."  (*Id.* at 4.)

The court did not decide Ho's exempt status by reference to industry standards, job descriptions, policy manuals, or any other purportedly "common" evidence.  Rather, it could decide Ho's claims only by evaluating evidence of *the work he actually performed*, including his own testimony and performance evaluations.  No "common" evidence could have permitted the court to determine, for example, how Ho spent his time and the degree to which he exercised judgment and discretion—both of which are elements of the exemptions applicable to Sutherland

---

*Nguyen v. BDO Seidman, LLP*, No. SACV07-1352, slip op. at 7-8 (C.D. Cal. July 6, 2009) [DKT#78] (denying class certification of unlicensed accountants and distinguishing C*ampbell* upon finding wide variation in duties and discretion of putative class members, including those with same job titles).

as well.[7]  Because these issues—the crucial substantive issues the jury will need to decide—can

be resolved only by examining the plaintiff's particular experiences, as evidenced by testimony

and performance-related documents, common issues do not predominate.

The court's analysis of whether Ho met Ernst & Young's realistic expectations likewise

required an examination of Ho's unique circumstances.  The court held that summary judgment

was proper even if Ho did not spend the majority of his time performing exempt work since Ho's

performance "was substandard for the position he held," because he arrived late for work, had

poor communication skills, and turned in sloppy work product.  (*Id.* at 7.)  These deficiencies

were established by introducing Ho's performance evaluations, evidence that is entirely unique

to him, not "common" to potential class members.

The summary judgment decision regarding another *Ho* plaintiff, Sarah Fernandez—who

held the same position as Sutherland—confirms that an individualized analysis is needed to

evaluate the exempt status of a staff.  Both Ho and Fernandez were staff who purported to

represent "audit" staffs, among others.  The court found that Fernandez, like Ho, performed work

directly related to the business operations of Ernst & Young and its clients, but that the evidence

was "in conflict" as to whether she "exercised independent judgment" and regarding "the amount

of time she spent performing work that meets the test of the exemption."  (*Fernandez* at 5.)

Whereas Ho decided "what client questions to answer" and "whether further research was

necessary" to complete an assignment, Fernandez claims that she followed "specific guidelines"

and reported all variations from those guidelines.  (*Ho* at 5; *Fernandez* at 6.)  Whereas Ho "had

---

[7]  California law incorporates many of the federal regulations that interpret the FLSA.  *See* Cal. Code
Regs., Tit. 8, § 11040(1)(A)(2)(f) ("The activities constituting exempt work and non-exempt work shall
be construed in the same manner as such terms are construed in the following regulations under the Fair
Labor Standards Act effective as of the date of this order:  29 C.F.R. Sections 541.201-205, 541.207-208,
541.210, and 541.215.")

substantial responsibilities with respect to clients and served as the primary contact for several clients," Fernandez claims that she only "match[ed] up financial data that already had been characterized by the client."  (*Ho* at 4; *Fernandez* at 7.)  Whereas Ho wrote "a forty-to-sixty page summary" of his research, Fernandez contends that she prepared only "form letters containing standard language."  (*Ho* at 4; *Fernandez* at 8.)

Thus, several of the elements of the administrative exemption that apply to Sutherland were satisfied as a matter of law as to Ho but are in dispute as to Fernandez.  That one staff was exempt as a matter of law while another arguably was not undermines Sutherland's contention that her claim can be resolved using common evidence sufficient to permit a uniform judgment as to thousands of individuals:

> The fact that the same court found that two [] professionals employed by the same public accounting firm could be subject to varying levels of supervision that potentially affected their exempt status, plainly illustrates the need for an individual inquiry as to the level of supervision of each putative class member.

*Nguyen,* slip op. at 14 (discussing *Ho* decisions) (internal quotations and citations omitted).

### 2.    The Record Confirms The Need For Individualized Proof.

The record evidence confirms that resolving the disputed elements of the exemptions would require the jury to analyze evidence specific to a particular plaintiff, the antithesis of "common" evidence and class treatment.

### a.    Discretion and Judgment

Both the professional and administrative exemptions require that an employee exercise discretion and independent judgment, either "consistently" or with respect to "matters of significance."  The record proves that putative class members did so to varying degrees and in varying ways, depending on their particular circumstances.

Sutherland contends that no putative class members can exercise the requisite discretion and judgment because industry standards and Ernst & Young policies require unlicensed accountants to work under the supervision and review of a certified public accountant. (Mot. at 6-8.) The *Ho* court squarely rejected this argument in holding that the original named plaintiff exercised sufficient discretion and judgment, even though he was not a licensed CPA. (*Ho* at 5.) Sutherland's attempt to re-litigate this issue should be rejected.

Other courts have rejected this precise argument as well. *See Mekhitarian*, 2009 WL 6057248 at *5 (accounting industry standards and company rules requiring review of unlicensed employees' work do not preclude finding that they are exempt); *Campbell*, 253 F.R.D. at 602 (same). A California court rejected this argument in another accounting industry lawsuit, explaining that "exercising discretion and independent judgment is not incompatible with being under the control and supervision of someone else":

> If this were the law, no employee with a supervisor could be exempt from California's overtime provisions. Junior associates at law firms who are under the control and supervision of partners would not be exempt. Even the highest-ranking officers of a company are under the control and supervision of a board of directors or shareholders.[8]

RJN, Ex. D (*Ruiz v. PriceWaterhouseCoopers LLC,* Case Nos. BC 287920, 287921, 287998, 287922 (L.A. Superior Court, December 8, 2003), slip op. at 6). As the *Ruiz* court recognized, the relevant regulations explain that employees exercise the requisite discretion and judgment "even if their decisions or recommendations are reviewed at a higher level." 29 C.F.R. § 541.207(e)(1) [now 541.202(c)] (exercise of discretion and independent judgment "does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review."); *see also Amendola v. Bristol-Myers*

---

[8] As the *Ruiz* court noted, Sutherland's argument would apply equally to other unlicensed professionals, including, for example, attorneys who have taken the bar examination and are awaiting admission.

*Squibb Co.*, 558 F. Supp. 2d 459, 476 (S.D.N.Y. 2008) ("courts have frequently concluded that the administrative exemption applies even in those situations in which the employee's discretion in the performance of her duties is circumscribed by an employer's detailed instructions or industry regulations . . . [or] strict guidelines); *Copas v. East Bay Mun. Utli. Dist.*, 61 F. Supp. 2d 1017, 1036 (N.D. Cal. 1999) (independent judgment and discretion despite working in highly-regulated field of employee benefits); 29 C.F.R. § 541.203(a-f) (exempt employees may include insurance adjustors and financial services employees who work in heavily regulated industries).[9]

Indeed, the industry standards themselves acknowledge that unlicensed professionals exercise judgment and are supervised, not uniformly, but to varying degrees. As explained by the American Institute of Certified Public Accountants ("AICPA"), its Auditing Standards do not specify any particular level or form of supervision. RJN, Ex. E (Amicus Curiae Brief of AICPA in Support of Appellant for Reversal in *Campbell v. Pricewaterhouse Coopers. LLP* (9th Cir. Docket No. 09-16370, Nov. 9, 2009) [DKT#19]. Rather, section 311.28 provides that the:

> extent of supervision appropriate in a given instance depends on many factors, including the complexity of the subject matter and the qualifications of persons performing the work, including knowledge of the client's business and industry.

The standards further recognize that "[t]he nature and extent of supervision and review must necessarily reflect *wide variances* in practice" depending on "the work done and *judgment exercised* by his subordinates, who in turn must meet the responsibility attaching to *the varying gradations and functions of their work*." § 210.3 (emphasis added); *see also* § 230.06 ("Auditors should be assigned to tasks and supervised commensurate with their level of knowledge, skill,

---

[9] Sutherland misconstrues the relevant standards in arguing that putative class members do not "make any *final decisions* on any matters of significance." (Mot. at 2 [emphasis added].) Further, in addressing the administrative exemption, she incorrectly cites to cases interpreting the discretion element of the professional exemption, the executive exemption, and a prior version of the administrative exemption. (*Id.* at 20.)

and ability . . . ."). Thus, rather than mandating a degree of supervision that uniformly eliminates the exercise of discretion, the industry standards on which Sutherland relies recognize exactly the opposite: Unlicensed professionals must exercise "judgment," and the level of supervision depends on individualized and "varying" factors. Sutherland's own expert concedes this point. (Carmichael Tr. 153-54 [extent of supervision depends on many factors, including complexity of subject matter and individual's knowledge and qualifications].)[10]

Sutherland's own evidence confirms that wide variation exists among staffs concerning the exercise of discretion and judgment. A comparison of Sutherland's deposition testimony to that of Stephen Morris, another Core Assurance staff whose declaration the *Ho* plaintiffs proffered and Sutherland cites, proves this point. Sutherland testified that she did not attempt to apply independent professional judgment in applying auditing and accounting standards (Sutherland Tr. 176:24-177:11), whereas Morris he used independent and professional judgment in all the tasks he performed (Morris Tr. 93:10-18). Sutherland "does not recall" ever making suggestions about how an audit should be conducted (Sutherland Tr. 64:22-65:12), whereas Morris made "suggestions as to how previous work products or approaches could be improved" (Morris Tr. 81:19-82:1, 90:8-15). And Sutherland claims that she never identified potential non-compliance with auditing standards on financial statements (Sutherland Tr. 173:3-13), whereas Morris did exactly that (Morris Tr. 90:17-21).

---

[10]  Dr. Carmichael did not review *any* of the deposition testimony of Sutherland or her witnesses. (Carmichael Tr. 7:7-12; 8:10-20.) In fact, his opinion about how industry standards and Ernst & Young policies apply, in practice, to the duties of staffs nationwide is based on a handful of declarations from California employees who worked outside the relevant period, many of whom contradicted their declarations in subsequent deposition testimony. (Carmichael Report, App. 3.). Sutherland also mischaracterizes Ernst & Young's expert report and testimony. (Mot. at 25-26). While Mr. Sachs testified that industry standards and policies apply to all staffs, he opined that a staff's duties vary depending on many factors, including the size of the client, whether the client is a public or private company, the audit risk, and the degree of supervision. (Sachs Report at 15-16; Sachs Tr. 95:16-25; 105:3-18; 135:11-136:1-3.)

The record is replete with additional examples of putative class members exercising discretion and judgment that satisfies this requirement of the exemptions. Much of this evidence comes from the deposition testimony of Sutherland's own witnesses.

- Peter Rothacker, a Core Assurance staff whose declaration the *Ho* plaintiffs proffered, testified that he exercised discretion and judgment as a staff by delegating work to other staffs; by evaluating other staffs, including judging the quality of their work and assessing their ability to work independently, engage with clients, and meet deadlines; and by prioritizing assignments. (Rothacker Tr. 157:2-10; 160:12–162:13; 167:1-14; 176:24-179:20; 246:7-12; ; 165:8-166:15; 96:10-100:10; ; 104:4-9; 105:8-106:5; Harris Dec. ¶ 10; Long Dec. ¶ 9.)

- While Sutherland claims that staffs cannot plan client projects or deviate from those plans (Mot. at 9-10), other staffs did exactly that. (Morris Tr. 146:11-147:17; 159:3-161:1 [expected to challenge audit plan]; Contreras Dec. ¶ 4 [researched audit standards and challenged audit steps]; Wyatt Dec. ¶ 3 [helped plan audit as staff 1; as staff 2, larger role in planning and setting materiality thresholds]; Chau Dec. ¶ 7 [helped plan engagement]; Duttlinger Dec. ¶ 15 [used judgment and discretion to "identify unusual items or to expand upon set parameters" and make audit adjustments]; Hendershott Dec. ¶ 9 [responsible for memo that justified taking substantive-based approach to audit]; *see* Borowski Tr. 44:13-20, 46:15-47:24 [staffs can participate in approving audit plans and depart from initial plan, such as when unanticipated circumstances arise].)

- While Sutherland claims that staffs may communicate with clients only regarding insignificant issues (Mot. at 9), others worked with the client's employees, including chief accounting officer, "on a daily basis" and often communicated with clients regarding delicate issues such as client accounting errors. (Duttlinger Dec. ¶ 14; *see also* Harris Dec. ¶ 5 [if he identified potential issue in audit, he had discretion to take directly to client and report results]; Gibson Dec. ¶ 19 ["routinely spoke with controllers, property accountants, Directors of Finance, and Chief Accounting Officers"].)

- While Sutherland suggests that Ernst & Young's "Global Audit Methodology" dictates a staff's every move on an audit (Mot. at 8-9, 17), other staffs acknowledge that it is simply a "resource" or "research tool" that they could use if they "weren't so sure how to look at a certain account." (Morris Tr. 130:14-131:13; Blagrove Dec. ¶ 15 [necessary to "tailor" protocol to each client]; Liconti Dec. ¶ 16 [uses judgment in applying accepted standards and guidelines and makes modifications when necessary].)

- Sutherland's expert and other witnesses acknowledge that the amount of direction and supervision depend on a staff's experience and ability and the particular project: "[T]he supervision of someone with a lot of industry and auditing experience is of course going to be different than the supervision of a person that has relatively little auditing knowledge and experience." (Carmichael Tr. 176-177; *see* Morris Tr. 39:7-16; 49:6-19 [expected to use experience from prior engagements to work independently]; Rothacker

Tr. 188:24-189:7 [managed project with little supervision]; Gibson Dec. ¶ 18 [audited complex and risky accounts ordinarily tested by manager].)

This evidence demonstrates not only that putative class members exercise sufficient discretion and judgment, but that they do so in ways that vary widely depending on their rank, ability, experience, assignments, and supervisor.[11]  This evidence flatly contradicts Sutherland's argument that the jury could decide the "discretion and independent judgment" criterion by reference to common evidence.  Where, as here, this criterion requires analysis of an individual's particular work experiences, courts uniformly deny class certification.  *See, e.g., Mekhitarian*, 2009 WL 6057248, at *2; *Wirth*, slip op. at 6; *Nguyen*, slip op. at 10.

b.     Time Spent On Exempt Duties

In applying the exemptions, the jury must decide whether an individual was primarily engaged in exempt duties.  *See* 29 C.F.R. § 541.700(a).  Sutherland contends that staffs do not perform exempt administrative work because they are involved in creating a "product" and thus are "production" workers.  (Mot. at 19.)  This is another example of her counsel attempting to re-litigate the California actions, as the *Ho* court has twice rejected this argument in holding that both Ho and Fernandez satisfied this element of the administrative exemption.  (*Ho* at 3-4; *Fernandez* at 4-5.)  The court's decisions on this point are entirely consistent with the applicable regulations, which make clear that exempt administrative work includes work in areas such as tax, finance, accounting, or auditing.  29 C.F.R. § 541.201(b); *see Piscione v. Ernst & Young*,

---

[11] *See Roe-Midgett v. CC Services, Inc.*, 512 F.3d 865 (7th Cir. 2008) (claims adjusters exercised sufficient discretion and judgment in comparing actual damage to claimed damage, even though they did not "make final liability decisions"); *Zalewski v. PNC Financial Services Group, Inc.*, 555 F.Supp.2d 555, 564 -565 (W.D.Pa. 2008) ("accounting professional" exercised sufficient discretion and judgment, where job included compiling reports for filings and audits, analyzing balance sheets, and verifying financial reports and data); *Viola v. Comprehensive Health Mgmt.*, 2010 WL 5463080, at *5 (M.D. Fla. Dec. 29, 2010) (event planner exercised judgment in "matters of significance," even though decisions subject to "final, supervisory approval").

24

*LLP*, 171 F.3d 527 (7th Cir. 1999) (rejecting argument that Ernst & Young professional was "production" worker); 29 C.F.R. § 541.201(c) (employees acting as advisors or consultants to their employer's clients, including tax experts and financial consultants, may be exempt).[12]

Because staffs indisputably perform exempt administrative work, the Court must decide whether how much exempt work they perform can be determined based on common, rather than individualized, evidence.  To assess this element of the exemption, the jury must examine the amount of time spent performing exempt work.  29 C.F.R. § 541.700(a).  Sutherland has offered no plausible explanation for how the jury could determine the work actually performed by all putative class members and "the amount of time" they spent on various duties by evaluating "common" evidence, such as Ernst & Young policies.  In fact, such evidence says nothing at all about how staffs spend their time.  Further, the record demonstrates material variation among staffs in how they spend their time—depending on rank, project, ability, and motivation:

- Fernandez, a Core Assurance staff, spent time monitoring cash-handling at casinos for fraudulent activity (Fernandez Tr. 67:10-68:18; 93:15-94:7; 96:13-19), whereas Sutherland never performed such work.  (*See* Long Decl. ¶ 11 [previously worked in gaming industry where she spent " about 5% of [her] time reviewing the client's internal audits to ensure compliance with . . . gaming regulations" and observing employees on casino floor, but now works in airline industry where such audits are not required].)

- One staff 2 spent the majority of her time auditing clients' information technology systems, work that Sutherland never performed.  (Choy Dec. ¶¶ 4, 7); *compare* Liconti Decl. ¶ 11 [audited accounts specific to health care clients, such as malpractice accounts].)

- On multiple engagements as a Core Assurance staff, Morris spent half his time assigning and reviewing the work of other staffs (Morris Tr. 153:19-156:1; 166:14-25), whereas another staff never did so (Fernandez Tr. 218:16-219:24).  *See also* Long Dec. ¶ 8 [spent

---

[12] The cases Sutherland cites did not involve employees, like staffs, who provide clearly administrative services to their employer's clients.  In *Reich v. State of New York*, 3 F.3d 581, 588 (2d Cir. 1993), the investigators were not involved in administering the police department's general business operations, but rather conducted criminal investigations.  In *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 534-35 (2d Cir. 2009), the underwriters were not involved in administering clients' general business operations, but rather primarily sold loan products and earned "production incentives" based on their sales.

"a good deal of time" supervising other staff]; Liconti Dec. ¶ 13 [responsible for "delegating appropriate work" to other staffs]; Liconti Dec. ¶ 11 [staff in health care group may perform more senior activities because of "nature of engagements"].)

- The only research Fernandez performed was reviewing client profiles from their internet sites or pulling information on the company's stock (Fernandez Tr. 184:25-185:2; 185:14-186:5), whereas Brad Silicani, another Core Assurance staff, spent significant time researching technical issues regarding how certain accounts should be treated during an audit. (Silicani Dec. ¶¶ 3, 4, 7, 12, 13); *see also* Vanden Berg Decl. ¶ 8 [used research tool to develop new audit testing techniques].)

- Even the duties of a particular staff vary widely based on the particular project, as one Core Assurance testified that she spent as much as 50 percent of her time interacting directly with client personnel on one project, but had no client interaction on another. (Fernandez Tr. 193:12-194:6; 67:10-68:18; *see* Hendershott Dec. ¶ 13 [on small engagement worked at client site on his own—"not the norm on larger engagements."].)

Because staff job experiences vary widely based on numerous factors, no "common" evidence would permit a determination of their duties sufficient to permit a uniform decision regarding time spent on exempt tasks.[13]  For this reason as well, class certification should be denied.  *See, e.g.*, *Hendricks*, 263 F.R.D. at 84 (denying certification under FLSA and Rule 23 where some individuals spent significant time performing supervisory work, but others did not).

### c.     Learned Professional Exemption

In applying the professional exemption, the jury must determine whether staffs performed work requiring advanced knowledge in a field of science or learning.  29 C.F.R. § 541.301(a). Sutherland acknowledges, as she must, that unlicensed accountants may qualify.  (Mot. at 14); 29 C.F.R. § 541.301(e)(5) ("Many other accountants who are not certified public accountants but

---

[13]  Nor could the jury use common evidence to decide whether particular individuals were not primarily engaged in exempt work as a result of their own poor performance.  *See Reyes v. Texas EZpawn, L.P.*, 2007 WL 101808, at *5 (S.D. Tex. Jan. 8, 2007) (granting motion to decertify and noting that employer's defense required individualized proof, where unsatisfactory performance reviews would be introduced for plaintiffs who had exempt duties but either failed or refused to exercise them).

perform similar job duties may qualify as exempt learned professionals.")[14]  Because the learned

professional exemption might apply to unlicensed staffs, the Court must determine whether it can

be evaluated based on common evidence.  Where, as here, education, training, job skills, and

experience varied widely among employees, it cannot.  *See Nguyen*, slip op. at 13, n. 21, and 14.

Staffs arrive at Ernst & Young with a variety of backgrounds and apply their advanced

knowledge to varying degrees.  Some came to Ernst & Young with college degrees (Sutherland),

while others had masters' degrees in accounting (Siciliani).  (Sutherland Tr. 84:3-18; Siciliani

Dec. ¶ 2.)  Some came to Ernst & Young with relevant prior work experience, while others did

not.  (Gibson Dec. ¶ 6 [worked as acting accountant at $20 million company]; Duttlinger Decl.

¶¶ 3, 4 [worked as teaching assistant for financial accounting course and for small accounting

firm].)  Some consistently attempted to expand their technical knowledge (such as Blagrove,

who took optional health care industry training) (Blagrove Dec. ¶ 6), while others did not (such

as Fernandez, who did not try to "learn anything more than was necessary" for the task at hand

(Fernandez Tr. 219:4-7)).

Likewise, putative class members with the requisite "advanced knowledge" performed

work requiring that knowledge to varying degrees.  Some putative class members claim that their

job could be performed by any "attentive person with basic arithmetic, English language, and

typing skills."  (Alsheleh Dec. ¶ 6.)  By contrast, the work of other putative class members

clearly required advanced knowledge.  (*See, e.g.,* Morris Tr. 50:8-19 [accounting degree

necessary because staff need "to understand how financial statements and debits and credits

worked on a conceptual level"]; Vanden Berg Decl. ¶ 4 [staff with masters in accounting stated

that 80 percent of staff 1 work required accounting background].)

---

[14] Given that the law explicitly provides that unlicensed employees may satisfy this exemption,
Sutherland's argument that industry standards preclude this should be foreclosed.

In short, the evidence demonstrates that at least some staffs performed work "requiring advanced knowledge in a field of science or learning . . . ."  29 C.F.R. § 541.301(a); *see also Piscione*, 171 F.3d at 543-46 (unlicensed employee with degree in mathematics and 20 hours of continuing education qualified for learned professional exemption because his work required some level of specialized knowledge).  No evidence that is "common" to all staffs would permit a determination concerning which of them satisfy this test.  Rather, an analysis of each individual's "advanced knowledge" and its relevance to their job is necessary.  Such individualized analysis is not possible in a class action.  *See Hendricks*, 263 F.R.D. at 85 (in denying certification, court noted that, unlike named plaintiffs, some potential class members worked in jobs where accounting knowledge was essential).

d. <u>The Arbitration Defense</u>

Ernst & Young's staffs entered into agreements that require them to arbitrate "all claims, controversies or other disputes," including wage disputes, and prohibit arbitration of class claims.  (Reece Dec., Docket No. 29, Exs. C, D.)  When Ernst & Young moved to compel arbitration of Sutherland's claims, she argued that her agreement was unenforceable because arbitration would be cost-prohibitive.  She contends that the Court must evaluate the arbitration agreement on a "case by case" basis by considering such issues as "whether the litigant can pay the arbitration fees" and whether the cost differential between arbitration and litigation would deter an individual from arbitrating.  (Opp. to Motion to Compel, Docket No. 35 at 26.)

Such a "case by case" analysis is not possible in a class action.  While Sutherland estimates her potential damages as $1,867 and claims to lack the resources necessary to proceed in arbitration (Folkenflik Dec., Docket No. 34 ¶ 8), other putative class members may have significantly greater potential damages—depending on their salary, tenure, and alleged overtime hours—and far greater resources.  Under Sutherland's theory, these factors dictate whether an

individual would be deterred from arbitrating, and none of them can be evaluated based on evidence that is common to all class members.  Instead, the Court would need to examine the circumstances of each individual to decide whether his or her agreement must be enforced.

In short, if the Court accepts Sutherland's argument and denies the motion to compel arbitration on that basis, that decision would give rise to an inherently individualized issue: whether a putative class member is required by contract to pursue his or her claim in arbitration, if at all.  Because this issue goes to the heart of Ernst & Young's arbitration defense—which is a complete defense to an individual's participation in this action—and cannot be decided based on common evidence, class certification should be denied.  *Cf. Passa v. City of Columbus*, 2010 WL 1372455, at *7 (S.D. Ohio Mar. 30, 2010) ("necessary individualized determination of the enforceability of [the arbitration] provision militates against a finding of commonality").

B.      A Class Action Is Not The Superior Method Of Adjudication.

"Where each individual claim would have its own provable set of facts and measure of damages," a class action is not "superior."  *See Harris v. Initial Security, Inc.*, 2007 WL 703868, at *7 (S.D.N.Y. Mar. 7, 2007).  Because the substantive issues cannot be decided for thousands of potential class members based on evidence that is common to all of them, but rather require an examination of individual circumstances, class treatment is simply not possible, let alone superior.  *See In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 268 F.R.D. 604, 614 (N.D. Cal. 2010) ("[a]ny trial would be consumed by individualized inquiries into how each class member spent his or her day, making a class action no better than numerous individual actions.").

Class adjudication also is not superior because the putative class members have ample incentive to pursue individual claims.  In evaluating superiority, courts consider the interest of each putative class member in "individually controlling the prosecution or defense of separate actions."  Fed. R. Civ. P. 23(b)(3)(A).  Where "putative class members have sufficient monetary

incentive to pursue their own claims," this factor "weighs heavily against class certification." *Nguyen*, slip op. at 14.  Thus, in *Nguyen*, the court denied certification of a class of BDO Seidman tax and audit "associates" in part because the putative class members "are well-paid employees who are seeking years worth of overtime back-pay, penalties, and attorney fees."  *Id.*; *see Cima v. WellPoint Health Networks, Inc.,* 250 F.R.D. 374, 384 (S.D. Ill. 2008) (no superiority given potential damages of tens of thousands of dollars per person); *In re Home Depot Overtime Cases*, No. JCCP4229, 2006 WL 330169, at *5 (Cal. Super. Ct. Feb. 2, 2006) (denying certification in part because of "sufficient incentive to pursue a meritorious claim" given potential recovery of "at least $25,000/year, plus interest, penalties and attorney fees").

Putative class members here are sophisticated, well-paid, and in many instances have high-value claims.  Ho, for example, earned a salary of $75,000-$80,000, which would have translated into tens of thousands in potential overtime damages—not counting the additional penalties he sought.  (*Ho* at 2.)  Another *Ho* plaintiff seeks damages in excess of $175,000.  (Knopp Dec. ¶ 9.)  These amounts adequately incentivize a putative class member to pursue an individual claim, especially because a successful plaintiff may recover attorney's fees.  While Sutherland prefers not proceed in an individual arbitration, each putative class member whose declaration the California plaintiffs proffered stated that he or she would consider filing an individual action if a class is not certified.  Thus, Sutherland's own witnesses undermine her claim that "no realistic alternative exists" to a class action.  (Mot. at 31.)

II.     FLSA "CERTIFICATION"

The same evidentiary record that precludes Rule 23 certification also requires that Sutherland's FLSA motion be denied.

A.   <u>Sutherland's Motion Cannot Survive The More Stringent "Second Step" Scrutiny.</u>

In determining whether to "certify" a collective action under section 216(b) of the FLSA, Second Circuit courts generally use a two-step procedure.  *Myers*, 624 F.3d at 555.  First, "where the parties have yet to engage in any substantial discovery," the court must decide whether the plaintiff has demonstrated that she is sufficiently similarly situated to potential opt-in plaintiffs and whether notice should be issued.  *See Harrington v. Educ. Mgmt. Corp.*, No. 02 Civ. 0787 (HB), 2002 WL 1009463, at *2 (S.D.N.Y. May 17, 2002); *Myers*, 624 F.3d at 555.  Second, once substantial discovery is complete, the court conducts a more rigorous analysis to decide whether a trial would be manageable if the lawsuit proceeds as a collective action.  *See id.* (citation omitted).  At this second stage, the court considers factors similar to the Rule 23(b)(3) requirements, including "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations."  *Torres v. Gristede's Foods NY, Inc.*, No. 04 Civ. 3316 (PAC), 2006 WL 2819730, at *9 (S.D.N.Y. Sept. 29, 2006) (*citing Thiessen v. Gen. Electr. Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001) (noting "little difference" between the enumerated factors and Rule 23 requirements, since all "approaches allow for consideration of the same or similar factors, and generally provide a district court with discretion to deny certification for trial management reasons.").

Where, as here, sufficient discovery has occurred prior to the plaintiff's motion for notice, courts review the entire record and conduct the more rigorous inquiry.  *See e.g., Torres*, 2006 WL 2819730, at *9; *Hendricks*, 263 F.R.D. at 83 (applying second-step inquiry where "extensive discovery" had occurred); *Hinojos v. Home Depot, Inc.*, 2006 WL 3712944, at *2 (D. Nev. Dec. 1, 2006) (declarations and depositions provided sufficient evidentiary record to determine whether action could be managed on collective basis); *Smith v. T-Mobile USA, Inc.*,

No. CV 05-5274 ABC (Ssx), 2007 WL 2385131, at *5 (C.D. Cal. Aug. 15, 2007); *Ray v. Motel 6 Operating, Ltd. P'ship*, No. 3-95-828, 1996 WL 938231, at *4 (D. Minn. Mar. 18, 1996).  In particular, where a significant record exists, courts consider whether resolution of the claims would require the adjudication of individual issues, such that a collective action would be unmanageable and contrary to the interests of judicial efficiency.  *See Brooks v. Bellsouth Telecom., Inc.*, 164 F.R.D. 561, 568-69 (N.D. Ala. 1995); *but see Cunningham v. Elec. Data Sys. Corp.*, 06-civ-3530, 2010 U.S. Dist. Lexis 132127, at *13 (S.D.N.Y. Dec. 13, 2010).

Indeed, creating a collective action class even provisionally when it appears that such a class will not promote the purposes of collective treatment would be "an exercise in futility and wasted resources for all parties involved."  *Basco v. Wal-Mart Stores, Inc.*, No. Civ. A 02-009, 2004 WL 1497709, at *5 (E.D. La. July 2, 2004).  This approach recognizes that the plaintiff is "in effect asking [the] court to assist in [her] efforts to locate potential plaintiffs and thereby expand the scope of . . . litigation."  *Severtson v. Phillips Bev. Co.*, 137 F.R.D. 264, 266 (D. Minn. 1991).  Since it is not the role of courts to "stir[] up . . . litigation through unwarranted solicitation," courts should not order notice if class manageability concerns render the litigation a poor vehicle for collective treatment.  *Id.* at 267.

Given the vast discovery record here—the same, five-year-old record on which both Sutherland and the California plaintiffs rely in seeking Rule 23 certification—Sutherland's motion should be subject to heightened scrutiny.  It cannot survive this more rigorous review.  As shown above, the disputed elements of the exemptions cannot be decided based on evidence common to a class, but rather require a detailed analysis of putative class members' daily activities and responsibilities.  Such analysis is entirely inconsistent with collective treatment.  *See Hendricks*, 263 F.R.D. at 83; *Diaz v. Electr. Boutique of America, Inc.*, No. 04-CV-0840E

(SR), 2005 WL 2654270, at *4 (W.D.N.Y. Oct. 17, 2005).  Indeed, if the Court denies

certification of the Rule 23 class, granting conditional certification of the FLSA class would

simply delay the inevitable, as the Court would be required to revisit the same manageability

issues at a later point.  The huge amount of resources that would be required to litigate the action

before a subsequent motion to decertify cannot be recaptured.  *See Smith*, 2007 WL 2385131, at

*7-8 (interests of judicial economy and case manageability do not weigh in favor of proceeding

as a collective action where individualized issues are involved).

> B.    Sutherland Has Failed To Make Even A Modest Factual Showing
> That She Is Similarly Situated To The Members Of The Putative Class.

Sutherland's motion must be denied even under the less rigorous "first step" analysis,

because there is no basis to conclude that "audit" staffs nationwide are similarly situated to

Sutherland.  The Court may issue notice only if Sutherland demonstrates that she and potential

opt-in plaintiffs "together were victims of a common policy or plan that violated the law."

*Myers*, 624 F.3d at 555.  To meet this burden, Sutherland must do more than show that Ernst &

Young's policy of classifying staffs as exempt is "uniformly applied."  *See Guillen*, 2010 WL

4627851, at *8 n. 3; *Levinson v. Primedia Inc.*, No. 02 Civ. 2222 (CBM), 2003 WL 22533428, at

*2 (S.D.N.Y. Nov. 6, 2003).  Rather, she must make a factual showing that the classification was

improper as to her and putative class members.  *See Guillen*, 2010 WL 4627851, at *6-7;

*Levinson*, 2003 WL 22533428, at *1-2.  Because an employee's exempt status depends upon an

analysis of her actual job duties, Sutherland must provide facts that would indicate that putative

class members nationwide were primarily engaged in nonexempt duties.  *Id.* at *6-7.

Sutherland's showing on this point is entirely insufficient.  As shown above, the record

evidence, including the testimony of Sutherland's own witnesses, demonstrates wide variation

among staffs concerning the key elements of the exemptions.  Confronted with this record, the

only evidence Sutherland points to concerning the duties that staffs actually performed is the eight declarations proffered by the *Ho* plaintiffs, many of which were subsequently contradicted in depositions.  But regardless, none of those witnesses worked for Ernst & Young outside of California.  Nor did any of them work for Ernst & Young during the period relevant to Sutherland's FLSA claim—April 2007 to the present.  Thus, while Sutherland contends that all "audit" staffs nationwide were primarily engaged in nonexempt duties, and thus similarly situated to her, she does not rely on evidence of the job duties performed by a single such person. Her showing is entirely inadequate to justify notice to all staffs nationwide, let alone to satisfy the more rigorous second-step review that should apply.

Based on a similarly "thin" showing, the Court in *Guillen* denied plaintiff's motion to send notice to putative class members nationwide, where plaintiff had submitted only five affidavits from putative class members relating to nine of the defendant's 820 stores nationwide, and those affidavits were limited to one geographical area.  *See Guillen*, 2010 WL 4627851, at *7.  This evidence provided "little basis to believe that Guillen was similarly situated to [putative class members] throughout the country" regarding the job responsibilities he performed.  *Id.*; *Mike v. Safeco Ins. Co.*, 274 F. Supp. 2d 216, 221 (D. Conn. 2003); *see also Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 355-56 (E.D.N.Y. 2008) (restricting notice to individuals who worked in Coney Island since affidavits limited to that location); *Gonzales v. Hair Club for Men, Ltd., Inc.*, 2007 U.S. Dist. Lexis 26160, at *9 (M.D. Fla. Apr. 9, 2007) (denying "company-wide" certification where plaintiff submitted only two declarations from potential opt-in plaintiffs); *Harper v. Lovett's Buffet, Inc.*, 185 F.R.D. 358, 363 (M.D. Ala. Jan. 25, 1999) (limiting notice to

employees who worked at single location from which plaintiffs obtained declarations, absent showing that employees who from six different states were similarly situated).[15]

CONCLUSION

For the reasons stated above, plaintiff's motion should be denied.

Dated:  January 21, 2011                    Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP

By:  /s/ Daniel L. Nash_____

Attorneys for defendant Ernst & Young LLP

---

[15] Certifying both a Rule 23 class and FLSA collective action would create an irreconcilable conflict for staffs in New York because of the distinct, mutually exclusive procedures that apply.  Rule 23 binds all class members unless they affirmatively opt out of the class action, if permitted to do so.  *See* Fed. R. Civ. P. 23(c)(2).  By contrast, FLSA section 16(b) requires that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing."  29 U.S.C. § 216(b).  The impossibility of reconciling these "opt-in" and "opt-out" procedures should be fatal to certification of a "hybrid" class action.  *See De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301 (3d Cir. 2003) (reversing order granting certification of both an opt-in FLSA action and opt-out Rule 23 action as Congress made a "crucial policy distinction" in selecting an opt-in, as opposed to an opt-out, class action for FLSA actions); *Warner v. Orleans Home Builders, Inc.*, 550 F.Supp.2d 583 (E.D. Pa. 2008); *de la Cruz v. Gill Corn Farms, Inc.*, No. 03-CV-1133, 2005 WL 5419056, at *6 (N.D.N.Y. Jan. 25, 2005) (rejecting class certification in part because absent class members would be forced "to make the confusing choices of opting into an FLSA overtime action and then deciding whether [to] opt out of a [state] overtime action"); *but see Cohen v. Gerson Lehrman Group*, 686 F.Supp.2d 317 (S.D.N.Y. 2010); *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 374 (S.D.N.Y. 2007).